UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>NICHOLAS STEVEN ZASTROW,<br>Defendant. | 4:16-CR-40004-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Nicholas Steven Zastrow is before the court on a felony indictment charging him with possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d), 5845(a)(1) and 5871. See Docket No. 1. Mr. Zastrow has filed a motion to suppress physical evidence and statements deriving from a warrantless search of his residence. See Docket No. 26. The United States of America (government) resists the motion. See Docket No. 30. This matter was referred to this magistrate judge for the holding of an evidentiary hearing and the making of findings of fact and a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge. The following is this court's recommended disposition.

**FACTS**

An evidentiary hearing was held on Mr. Zastrow's motion on Tuesday, June 7, 2016. Present at the hearing were Mr. Zastrow and his attorney, D. Sonny Walter. Assistant United States Attorney Jennifer Mammenga appeared on behalf of the government. Two witnesses testified at the hearing: Brookings Police Officer Adam Smith and Special Agent Kurt Wheeler of the Bureau of Alcohol, Tobacco and Firearms. From the evidence introduced at the hearing, the court makes the following findings.

At 5:43 a.m. on September 26, 2015, Brookings Police Department responded to a residence occupied by Mr. Zastrow and his friend, Cody Pomerenke, after a report of a disturbance. Both Mr. Zastrow and Pomerenke were arrested for felony aggravated assault, among other criminal offenses. Mr. Pomerenke was intoxicated at the time of his arrest. The residence was a rental property. Pomerenke's name was the only name on the lease. Mr. Zastrow had been staying with Pomerenke, with Pomerenke's permission, for some unknown period of time prior to September 26. Officer Smith testified he never asked Pomerenke if Mr. Zastrow was paying rent in return for staying at the residence.

The residence consisted on the main floor of one enclosed bedroom with a door which Pomerenke used as his bedroom. The remainder of the house was an open living room/dining room area that also flowed into the kitchen with no partition or door. The living room/dining room area had a two-cushion loveseat glider couch, some chairs, and a table with kitchen chairs arranged

around it. The loveseat was the only item of furniture suitable for sleeping in the combined room. The floor in the living room/dining room had piles of hunting gear, clothing, and miscellaneous items. There was plastic shelving set up that was full of miscellaneous items including ammunition cans. There was no television in the living room/dining room. No part of the living room/dining room area was partitioned, screened, or curtained off to create privacy. From the front door, one could see directly into the living room/dining room area. There were two doors to the residence, but Pomerenke was required to traverse through the living room/dining room area in order to reach his own bedroom--the door to Pomerenke's bedroom was located in the middle of the living room/dining room. Likewise, one would have to traverse the living room/dining room area to reach the kitchen or the basement stairs.[1]

Both men appeared in state court and were granted bond. A condition of bond was that both men turn over all weapons to law enforcement.

At approximately 7 p.m. on the same day, September 26, Pomerenke was released from jail. Officer Smith testified that prior to being released from jail on his own, an inmate would be required to blow .00 on a preliminary breath test to demonstrate that the inmate is no longer intoxicated. Officer Smith testified that when he made contact with Pomerenke on the evening of September 26, he observed nothing that would have indicated Pomerenke was under the influence of alcohol.

[1] No description was given of the makeup of the house in the basement.

Officer Smith was contacted via radio and asked to pick Pomerenke up at the jail and transport him to his home for the purpose of taking custody of Pomerenke's firearms. Officer Smith testified Pomerenke made the request for transportation and to have an officer come to his home to take custody of his firearms. Officer Smith picked Pomerenke up at the jail and drove him to his house. Pomerenke rode in the front passenger seat of Officer Smith's patrol car without any handcuffs or any other type of restraint. Upon arrival there, the house was discovered to be locked and Pomerenke did not have the keys with him.[2] Pomerenke decided to enter the house through an open, unlocked window. He then let Officer Smith in through the front door. Officer Smith asked Pomerenke where Mr. Zastrow stayed and Pomerenke indicated the living room/dining room area.

With Pomerenke's permission, Officer Smith, Sergeant Terry Coon, and Pomerenke began collecting firearms from throughout the house. Some 29 firearms were collected--some rifles, revolvers, pistols, shotguns and two BB guns. Some of these firearms were in a locked gun safe that Pomerenke unlocked and emptied of firearms, giving the guns to the officers. Some of the firearms were located in the living room/dining room area.

Upon collecting all these guns in the house, Pomerenke told Officer Smith he had two more firearms in his truck parked outside that he wished to turn over to him. Pomerenke could not locate his truck keys. Officer Smith

---

[2] It was discovered later that Pomerenke's keys were in police possession at the jail. No evidence was introduced that either Pomerenke or Officer Smith knew this at the time.

went outside and checked the two front doors to the truck, both of which were locked.[3] Officer Smith left Pomerenke's house shortly thereafter with the 29 firearms collected thus far.

Almost immediately after leaving, Officer Smith telephoned Sergeant Coon because he was worried about Pomerenke's mental state and leaving him with access to the two firearms in the truck. Sergeant Coon instructed Officer Smith to return to Pomerenke's house and attempt to get the firearms from the truck.

Officer Smith came back to the home and knocked on the front door. The officer could see into the house and observed Pomerenke standing in the living room area. Pomerenke answered the door. Officer Smith asked Pomerenke if he could enter and assist Pomerenke in finding his truck keys. Pomerenke consented. Officer Smith entered the home a second time and began searching for Pomerenke's keys. Pomerenke was also searching, including searching in the living room/dining room area.

Under a cushion on the loveseat where Mr. Zastrow slept Officer Smith discovered a shotgun with a short barrel which is the subject of the charges Mr. Zastrow faces in this case. No part of the shotgun was visible prior to Officer Smith removing the loveseat cushion. Mr. Zastrow later made incriminating statements regarding the ownership of the shotgun. Officer

---

[3] There was no testimony to this effect, but the court infers the truck had four doors as Officer Smith later testified about a back door on the truck which was later discovered to be unlocked. Officer Smith did not check the back door and had assumed it, like the front doors, was locked.

Smith never had a search warrant for any of the searches he conducted of the Pomerenke residence on September 26.

Mr. Zastrow now moves to suppress the shotgun and his statements. He argues the warrantless search of the couch by Officer Smith violated his Fourth Amendment right against unreasonable searches and seizures because Pomerenke did not have the authority to consent to search an area of the house Mr. Zastrow used as his bedroom. Mr. Zastrow argues his statements are derivative "fruit of the poisonous tree" of the Fourth Amendment violation and should similarly be suppressed.[4]

**DISCUSSION**

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331 (1990). In determining the reasonableness of a search, courts are to balance "the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. A search of a home without a warrant supported by probable cause is usually unreasonable. Id. "[N]o zone of privacy is more clearly defined than a person's home: '[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.' " United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997) (quoting Payton v. New York, 445 U.S. 573, 590 (1980)).

[4] Special Agent Wheeler's testimony was solely to the effect that, after Mr. Zastrow filed his motion to suppress, Agent Wheeler made several unsuccessful attempts to locate Cody Pomerenke for purposes of securing his testimony at the evidentiary hearing.

There are, however, several exceptions to the warrant requirement "where the public interest is such that neither a warrant nor probable cause is required." Buie, 494 U.S. at 331. The burden is on the government to establish that an exception to the warrant requirement applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005); United States v. Weston, 443 F.3d 661, 668 (8th Cir. 2006). The government argues that Officer Smith reasonably believed that Pomerenke had the authority to give consent to search the living room of Pomerenke's home which Mr. Zastrow was using as his bedroom.

The Supreme Court has held that when the government attempts to justify a warrantless search by asserting voluntary consent from a third party, the government must show that the third party had common authority over the premises or effects sought to be searched or a sufficient relationship to said premises or effects. United States v. Matlock, 415 U.S. 164, 171 (1974). In explanation, the Court stated that common authority over property rests not with a legal interest in the property, but "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7.

In deciding whether a third party had authority to give consent to search, the officer "must reasonably believe that, given the totality of the

circumstances, the third party possesses authority to consent." Weston, 443 F.3d at 668 (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Pennington, 287 F.3d 739, 746-747 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and the owner, but how that relationship appears to the officer who asked for consent.")). This standard is an objective one: "would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" Rodriquez, 497 U.S. at 189 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)).

In Frazier v. Cupp, 394 U.S. 731, 740 (1969), the Court found that the defendant's cousin had the authority to consent to a search of a duffle bag that both the defendant and the cousin shared and that the defendant had left at his cousin's house.

In the Weston case, the court held that the officers reasonably believed that Weston's ex-wife had authority to give consent to search Weston's house because the ex-wife and Weston had been married, they had a child together, the officer knew that the ex-wife and Weston had remained close despite their divorce, the officer had seen the ex-wife at Weston's home three times in four years, and at the time the officer sought consent, the ex-wife was inside Weston's home despite the fact that Weston was not home. Weston, 443 F.3d at 668.

In the Pennington case, officers knocked on Pennington's door. Pennington, 287 F.3d at 747. While the front door was being held open, the

officers could see a suspicious bag lying on the floor within two feet of Mike Vickery, a person whose name the officers had recently heard in connection with the manufacture of methamphetamine. Id. at 746. The officers asked Vickery to toss them the bag through the open front door and Vickery complied. Id. The court concluded that Vickery's act of "dominion and control" over the bag gave the officers a reasonable basis for believing that Vickery had the authority to give consent to search the bag. Id. at 747. Thus, the court held that the search of the bag did not violate the Fourth Amendment. Id.

In United States v. Baswell, 792 F.2d 755, 759 (8th Cir. 1986), a caretaker of a vacation home had a key to the home and authority to enter the home for the limited purpose of making repairs and cleaning for compensation. The defendant Baswell, by contrast, had authority to stay in the house and use it fully and freely for his own benefit, a right of use not accorded to the caretaker. Id. However, the court approved the caretaker's authority to grant consent to search under the agency theory of "apparent authority," citing to the Supreme Court case of Stoner v. California, 376 U.S. 483, 488-489 (1964). See Baswell, 792 F.2d at 759.

In the Stoner case, clues discovered after a robbery led the police to believe that one of the robbers was residing at the Mayfair Hotel. Stoner, 376 at 484. The officers went to the hotel and asked the night clerk whether Stoner was registered at the hotel. Id. at 485. The night clerk responded in the affirmative, but indicated that Stoner was not in his room at the moment. Id. The police asked for permission to search Stoner's room, explaining that they

believed Stoner had been involved in a robbery and that the police were concerned there might be a weapon in the room. Id. The night clerk gave the police permission to search Stoner's room and opened the door to Stoner's room with a hotel key. Id.

The Supreme Court held that the search was unreasonable under the Fourth Amendment because the night clerk did not have the authority to consent to a search of Stoner's room and the police did not reasonably believe that the clerk had such authority. Id. at 488-489. This was true even though it was implicit in Stoner's rental of the hotel room that he had given permission to persons such as maids and repairmen to enter his room in the performance of their duties. Id. at 489. Such permission did not constitute acquiescence in the night clerk's giving the police consent to search the entire room. Id.

In a passage that strongly calls into question the Baswell court's characterization of the Stoner decision, the Supreme Court stated that "the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority' " Id. at 488. The Court went on to state that:

> it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. . . . [W]e ought not to bow to them in the fair administration of the criminal law.

Stoner, 376 U.S. at 488 (quoting from Jones v. United States, 362 U.S. 257, 266-267 (1960)). That Fourth Amendment analysis does not depend on

common law property theories like apparent authority was made even more clear in the subsequent case of Matlock, in which the Court stated that, "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rather rests on mutual use of the property by persons generally having joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7 (citing Stoner, 376 U.S. 483).

In United States v. Nichols, 574 F.3d 633, 635 (8th Cir. 2009), the defendant owned the home, and his girlfriend and her daughter lived with him, but the girlfriend had no property interest in the dwelling. The girlfriend found a disk with pornographic pictures of her daughter on it and turned it over to the police. Id. The girlfriend had unrestricted joint access to the entire residence, including the computer and the computer disk searched by the police. Id. She slept there every night, kept her possessions there, received mail there, paid for the upkeep of the house, bought groceries, and freely occupied the house as a possessor. Id. The Eighth Circuit, relying on Matlock, rejected Nichols' argument that the girlfriend had no authority to consent because she lacked a legal property interest in the realty. Id. at 636 (citing Matlock, 415 U.S. at 171 n.7). In the alternative, the Eighth Circuit held that, even if the girlfriend lacked common authority over the house, the police reasonably believed that she had common authority. Id. at 636-37.

Mr. Zastrow argues that no place in a home is more private than one's bedroom and no place within the bedroom is more private than one's bed.

Mr. Zastrow argues Officer Smith knew Mr. Zastrow was using the living room/dining room as his bedroom and the loveseat as his bed, and it was clear to Officer Smith that Pomerenke had no authority to give Officer Smith consent to search the loveseat.

But the Fourth Amendment analysis does not turn on the label one places on a room, be it "bedroom" or "living room" or "broom closet." What is crucial to the analysis of the totality of the facts is whether the person granting consent enjoys "mutual use of the property" and has "joint access or control for most purposes." Matlock, 415 U.S. at 171 n.7. Here, because Pomerenke had to continually traverse the living room/dining room to access his own bedroom and the kitchen, because Mr. Zastrow's sleeping area was not privacy-protected in any way (indeed it was visible from the front door), and because Pomerenke had joint access and control over the living room/dining room for most purposes, Pomerenke had the authority to grant consent to Officer Smith to search the living room/dining room. The court concludes that Officer Smith's search of Pomerenke and Mr. Zastrow's residence pursuant to Pomerenke's consent did not violate Mr. Zastrow's Fourth Amendment rights.

Mr. Zastrow argues that incriminating statements he made to police after they discovered the shotgun under the loveseat cushions should be suppressed as fruit of the poisonous tree of the violation of his Fourth Amendment rights (i.e. by the warrantless search). See Docket No. 28 at p. 4 (citing Wong Sun v. United States, 371 U.S. 471, 487-88 (1963)). However, because the court has concluded that the police did not violate Mr. Zastrow's Fourth Amendment

rights in the search that resulted in discovery of the shotgun, the "tree" was not poisonous and the "fruit" thereof need not be suppressed.

**CONCLUSION**

This magistrate judge respectfully recommends denying defendant Nicholas Zastrow's motion to suppress [Docket No. 26] in its entirety.

**NOTICE TO PARTIES**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED June 9, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge